UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION


RICK MARVIN RHINEHART,                           Civ. No.: 2:15-cv-01704-AC

                              Plaintiff,          OPINION AND ORDER

              v.

CAROLYN COLVIN,
Commissioner of Social Security
Administration,

                              Defendant.
_____

Merrill Schneider
Schneider Kerr Law Offices
PO Box 14490
Portland, OR 97239

        Attorney for Plaintiff

Billy J. Williams, U.S. Attorney
Janice Hebert, Assistant U.S. Attorney
1000 SW 3rd Avenue, Suite 600
Portland, OR 97204
Michael Howard


PAGE 1 - OPINION AND ORDER

Special Assistant U.S. Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104

Attorneys for Defendants

ACOSTA, Magistrate Judge:

*Introduction*

Rick Marvin Rhinehart ("Claimant"), seeks judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"). *See* 42 U.S.C. §§ 401-433. This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with F.R.C.P. 73 and 28 U.S.C. § 636(c). Following careful review of the record, the court reverses the decision of the ALJ and remands the matter for further proceedings.

*Procedural History*

Claimant protectively filed an application for DIB on December 21, 2011, alleging an onset date of December 31, 2010. The application was denied initially on April 5, 2012, and on reconsideration on July 31, 2012. On January 14, 2014 a hearing was held before Administrative Law Judge ("ALJ"), Marie Palachuk, who issued a decision on February 7, 2014 finding Claimant not disabled. The Appeals Council denied Claimant's request for review on July 13, 2015 and the ALJ's decision became the final decision of the Commissioner. Claimant filed for review of the final decision in this court on September 9, 2015.

PAGE 2 - OPINION AND ORDER

*Background*

Claimant was born in 1956 and was 57 years old at the time of his hearing. Tr. 49. Claimant completed his GED. His past relevant work experience includes automobile sales person, merchandise deliverer, groundskeeper, fence erector, and farm worker. Tr. 63-64. Claimant has not engaged in substantial gainful activity since December 31, 2010. Tr. 22. Claimant last met the insured status requirements for DIB on September 30, 2013.

Claimant alleges disability because of a heart condition, type II diabetes, lower back pain, right shoulder injury, right arm injury, right hand injury causing lack of grip, right foot gout, right knee injury and pain, left shoulder injury causing lack of mobility and pain, and left neck numbness following a period of sitting. Tr. 53-54, 68.

*Standards*

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 614 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden, a claimant must demonstrate his inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *see also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012).

PAGE 3 - OPINION AND ORDER

Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d. at 1110 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). It is "more than a mere scintilla [of evidence] but less than a preponderance." *Id.* at 1110-11 (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

## *Disability Evaluation*

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

At step one, the ALJ determines whether the claimant is engaging in substantial gainful activity ("SGA"). SGA is work activity that involves doing significant physical or mental activities for pay or profit, whether or not a profit is realized. 20 C.F.R. § 404.1572. If so, the claimant is not

disabled. 20 C.F.R. § 404.1520(a)(4)(i) & (b).

At step two, the ALJ must determine whether Claimant's alleged impairment or combination of impairments is sufficiently severe to limit Claimant's ability to work. 20 C.F.R. § 404.1520(c). This inquiry is a *de minimis* screening meant to dispose of groundless claims. *Edlund v. Massanari*, 253 F.3d 1152, 1158 (9th Cir.2001). If Claimant does not have one or more severe impairments, the claim is denied. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). However, if the court determines the Claimant has one or more severe impairments, the analysis continues on to step three. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

At step three, the ALJ determines whether the severe impairment or combination of impairments meets or equals the impairments listed in the regulations (the "Listings"). 20 C.F.R. § 404.1520(a)(4)(iii) & (d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the impairment is determined to meet or equal a listed impairment, or combination of impairments, then the claimant is disabled. *Id.* If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 C.F.R. § 404.1520(e); Social Security Ruling ("SSR") 96-8p, *available at* 1996 WL 374184.

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) & (f). Past relevant work means work performed within the last fifteen years that lasted long enough for a person to learn to do it, and was SGA. 20 C.F.R. §§ 404.1565(a). If Claimant has the RFC required to engage in past relevant work, Claimant is not disabled and the analysis ends. 20 C.F.R. § 404.1520(d)-(e). However, if Claimant does not have

PAGE 5 - OPINION AND ORDER

the RFC required to engage in his or her past relevant work, the analysis continues.

At step five, the burden of proof shifts to the Commissioner to demonstrate that Claimant can engage in some kind of SGA that exists in significant numbers in the national economy. 20 C.F.R. § 404.1520(g); *see Bowen*, 482 U.S. at 142 ("[T]he fifth and final step of the process determines whether he is able to perform work in the national economy in view of his age, education, and work experience. The claimant is entitled to disability benefits only if he is not able to perform other work") (citing 20 C.F.R. §§ 404.1520(f), 416.920(f))). If the claimant is able to do other work, he is not disabled; if the claimant is not, he is entitled to an award of benefits.

At step one, the ALJ determined Claimant last met insured status requirements on September 30, 2013 and had not engaged in SGA from the alleged onset date of December 31, 2010 through date last insured. Tr. 22.

At step two, the ALJ determined that through the date last insured, Claimant had severe impairments of coronary artery disease; diabetes mellitus; cervical/lumbar degenerative disc disease; right shoulder injury, status post-surgery; minor degenerative joint disease of the left shoulder; knee/foot pain; gout; and obesity. Tr. 22. This determination was based upon diagnoses by "medically acceptable sources" and a finding that the impairments cause more than a minimal effect on Claimant's "ability to perform basic, work-related activities." Tr. 25.

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Listings. Tr. 25-26.

The ALJ determined that Claimant had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except light work that requires more than occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching or crawling. Tr. 26. Additionally, the Claimant can

PAGE 6 - OPINION AND ORDER

never climb ropes, ladders, or scaffolds and is to avoid even moderate exposure to hazards such as commercial driving, unprotected heights, and moving machinery. *Id.* Finally, Claimant cannot reach with the left upper extremity. *Id.*

At step four, the ALJ concluded that Claimant had performed past relevant work as an automobile salesperson, a merchandise deliverer, a lubrication servicer, a groundskeeper (industrial), a driving instructor, a farm worker (livestock), and as a fence erector. Tr. 29. Consistent with the testimony provided by the vocational expert ("VE"), the ALJ concluded Claimant was unable to perform any of his past relevant work. *Id.*

At step five, the ALJ concluded that Claimant had acquired transferable skills from his past relevant work as an automobile salesperson. Tr. 29. The ALJ determined that based on Claimant's age, education, work experience, residual functional capacity, and transferable skills, Claimant could perform work in three occupations that exist in significant numbers in the national economy: (1) automobile self-service station attendant, (2) sales clerk, or (3) sales clerk food. Tr. 30.

*Discussion*

On appeal, Claimant argues the ALJ erred by: (1) improperly discounting Claimant's credibility; (2) failing to account for Claimant's right shoulder limitation in formulating Claimant's RFC; (3) identifying representative occupations that conflict with Claimant's RFC; and (4) identifying transferable skills without support of VE testimony.

I.      Subjective Symptom Evaluation.

The Ninth Circuit has developed a two-step process for evaluating the credibility of a claimant's own testimony about the severity and limiting effect of the claimant's symptoms. *Vasquez*, 572 F.3d at 591. First, the ALJ "must determine whether the claimant has presented

PAGE 7 - OPINION AND ORDER

objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282.

Second, "if the claimant meets the first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991)(en banc)).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284. The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96-7p,

*available at* 1996 WL 374186.[1]

Further, the Ninth Circuit has said that an ALJ also "may consider . . . ordinary techniques of credibility evaluation, such as the reputation for lying, prior inconsistent statements concerning the symptoms . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen*, 80 F.3d at 1284.

At step one, the ALJ determined that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 27.  At step two, however, the ALJ concluded that Claimant's statements regarding intensity, persistence, and limiting effects were "not fully credible."  *Id.*  The ALJ based her conclusion on seven points. Tr. 27-28.

A.    *Objective Medical Evidence and Physician Imposed Work Restrictions*

Although the ALJ found that Claimant suffered from medically determinable impairments which could cause Claimant's alleged symptoms, the ALJ determined that "there is very little evidence of any significant ongoing abnormality of the claimant's lower extremities or spine," and noted that Claimant's medical records "only show that there is tenderness with palpation of the foot/ankle and a diminished range of left shoulder motion, but no other significant motor, sensory, or reflex deficits." Tr. 27.

The Commissioner argues that the ALJ's assessment was correct, and suggests that the medical findings Claimant cites as evidence of limited range of motion of the spine are actually consistent with the ALJ's conclusion.

---

[1] Although SSR 96-7p was superceded by SSR 16-3p in March 2016, it was the operative policy interpretation ruling on credibility and subjective pain testimony at the time of the ALJ's decision.

As medical expert Dr. William Spence testified, Claimant has "five rather extensive degenerative changes in his spine." Tr. 44. Diagnostic imaging revealed Claimant had cervical spine spondylosis and disc degeneration, lumbar facet syndrome, myofacial pain syndrome, uncovertebral arthropathy, and possible foraminal encroachment at several locations in the spine. Tr. 295-96, 309. However, beyond diagnoses, the record provides very little insight into the impairing effect of these conditions. Claimant's medical records reflect treatment for lumbar spondylosis, lumbar radiculopathy, and a herniated lumbar disc in 2009. Tr. 306-08. In December 2011, Dr. Zachary Bailey noted that Claimant's range of motion in his back was limited in flexion and extension due to pain. Tr. 317. In January 2012, Dr. Larry Paulson observed:

> Spine: Lumbar flexions about 30° with a slight decrease in pain. Extensions to 15° with an increase in his pain. . . . pain with extension rotation to the right side more than the left. . . . pain with right lateral bending and extension more than to the left. . . . pain to palpation of the right PSIS. . . . pain over the posterior elements at the lumrosacral junction on the right side.
>
> Cervical Flexion causes some posterior neck pain. Extension is about 30° which causes some neck pain. Rotation is about 60° and causes some slight pulling. Lateral bending is about 10° and causes pain on the opposite side.

Tr. 295-96. Dr. Paulson's observations indicate Claimant had some moderate pain and discomfort in his lower back associated with movement. Nonetheless, the ALJ reasonably concluded that these tests did not correspond with the extreme severity of Claimant's alleged symptoms.

Moreover, approximately one month later in February 2012, further objective testing conducted by physical therapist Jan Mead showed:

> Lumbar range of motion: Sidebending right 40% of normal with increased pain; left, minimal pain with 40% of normal. Rotation right 75% of normal with increased pain; rotation left 80% of normal with minimal pain. Forward flexion within normal limits with significant

PAGE 10 - OPINION AND ORDER

> pain for forward flexion with a slow return. Backward bending is
> significant increase in pain and 10% of normal. Cervical range of
> motion: rotation right 65 degrees, left 65 degrees with increased pain.
> Sidebending right 27 degrees, left 22 degrees. Forward Flexion and
> backward bending within functional limits.

Tr. 458-59. Thus, within a month, Claimant's moderate back pain had significantly improved.

Again, ALJ reasonably concluded that the objective medical evidence was not consistent with

Claimant's assertions that his pain symptoms were extremely severe and precluded all activity.

In sum, while imaging and physical exams provide evidence that Claimant has medically

determinable impairments in his spine, the ALJ reasonably found the record to be insufficient to

support Claimant's alleged subjective lower back symptoms. For example, Claimant stated that he

could not bend forward, but his forward flexion was within normal limits. Although Claimant has

offered a different possible interpretation, the record does not provide grounds to reverse the ALJ's

rational interpretation.

The record contains scant objective medical evidence regarding Claimant's feet, ankle, and

knee allegations. In 2011, Dr. Traci Clautice-Engle found Claimant had an osteophyte formation

in the lateral calcaneocuboid joint, consistent with osteoarthritis and enthesopathy of the Achilles

tendon on his left foot and ankle. Tr. 277-78. In 2012, Dr. Joel Moore concluded that Claimant had

left ankle joint arthritis and right 2-4 metararsalgia. Tr. 299-300. In December 2013, as Claimant

was treated for gout, he walked with a left leg limp and his "first MT joint was red, warm, and tender

painful to touch." Tr. 644. Several days later, his gait had slowed but his foot was much less tender

to the touch. Tr. 642. On July 3, 2012, Nurse Practitioner Shawna Clark ("NP Clark") noted

Claimant walked with a normal gait and he could still flex to 90 degrees despite complaints of knee

pain; Claimant's right knee was unremarkable. Tr. 396-97. On October 9, 2013, Dr. Bailey

PAGE 11 - OPINION AND ORDER

observed Claimant's left knee was tender over medial joint lines but he had good range of motion. Tr. 547. Dr. Bailey suspected Claimant's knee pain was due to osteoarthritis. Tr. 548.

Accordingly, the objective medical evidence regarding Claimant's feet, ankle, and knee reflects only minimal functional limitations, with episodic pain symptoms that improved over time. The ALJ reasonably concluded that Claimant's pain symptoms related to his lower extremities were inconsistent with the objective medical evidence.

The ALJ further supported her finding by observing that the record does not reflect any physician-imposed restrictions. Tr. 27-28. Claimant argues that the absence of physician-imposed restrictions is irrelevant because Claimant was not working, he did not require any workplace restriction. The court disagrees. The fact that no physicians have recommended activity restrictions following any of Claimant's many treatment visits for complaints of pain is relevant: it is Claimant's burden to provide medical evidence, including evidence of functional limitations, to establish disability and/or physical limitations. 20 C.F.R. § 404.1512. Absent evidence of physician-imposed restrictions, Claimant's claims about the severity, intensity, and persistence of his subjective symptoms are simply not supported by the objective medical evidence.

For all the foregoing reasons, the ALJ's finding is affirmed.

B.    *Pain Medication and Inconsistent Statements.*

The ALJ determined that Claimant's testimony that he "usually takes his medication as prescribed but that they do not help his pain" conflicts with Claimant's functional reports where he indicated that medication helps his pain. Tr. 27. The ALJ also noted that Claimant had been out of compliance with his insulin regimen at times. Tr. 28.

At the hearing, the following exchange took place between Claimant and his attorney:

PAGE 12 - OPINION AND ORDER

Q:      [W]hat medications do you take currently?

A:      Metaformin, Lantis, Novolog, Flopidegrol [phonetic], aspirin, Simvastatin, metoprolol, Lisinock htz [phonetic], and nitro, as needed.

Q:      And how much do these things help with your pain and shortness of breath?

A:      The pain, it doesn't.  Doesn't help at all.

Q:      What about any side effects from those?

A:      Not that I know of.  I have had the doctors tell me that some of these medications don't help you lose weight.  In fact, they actually told me it would help me gain weight, which is why they wanted me to keep active and exercise and everything.

Tr. 60.  Claimant never testified as to whether he was compliant with his pain medication.  Echoing the ALJ, the Commissioner argues that Claimant's answers to the Pain and Fatigue questionnaire are inconsistent with the testimony cited above.  There, Claimant answered that "sleep and meds" make his pain better.  Tr. 60.  Claimant argues that because these statements were made two years apart, his worsening symptoms explain any discrepancy.

As a preliminary matter, the court notes that none of the nine medications Claimant mentioned in his testimony are prescribed for pain.  Tr. 60, 164, 226, 646.  Indeed, the ALJ noted that Claimant is "not taking any identifiable prescribed pain medication." Tr. 27-28.  Since none of these medications appear to have been prescribed for pain, Claimant's testimony was, therefore, not in conflict with his prior statements regarding the efficacy of pain medication.

Rather, Claimant indicated that it was a combination of sleep and medication that helped his pain.  At the same time, however, he stated that he had burning, aching pain in his lower back and neck that lasted "most all day," everyday, and that sometimes he had pain in his feet; that standing,

PAGE 13 - OPINION AND ORDER

walking, sitting for a long time, and bending made his pain worse; and that he "can't work at anything" for more than half an hour without needing to rest for a few minutes. *Id.* Therefore, it is unclear whether "meds and sleep," even if helpful, alleviate his pain to a functional level.

The Commissioner argues that Claimant's allegations of severe pain are undermined by the fact that he was not using pain medication at the time of the hearing. Claimant argues that he has attempted to use narcotic pain medication but has a documented intolerance for opioid-based medications. *See* Tr. 490.

Claimant's medical records and written responses to medical questionnaires reflect a history of both prescription narcotic pain medications and over-the-counter pain medications. In his initial disability application, Claimant indicated he was taking oxycodone and ibuprofen for pain. Tr. 164. In December 2011, Claimant was told to continue taking vicodin as needed. Tr. 317. On January 5, 2012, Dr. Moore discussed risk of bleeding, stomach ulceration, liver and kidney problems, and possible cardiac problems from being on high doses of anti-inflamatory medicines, especially when mixed with Plavix, and recommended that Claimant try using Tylenol instead. Tr. 296-97. Dr. Moore's warning suggests that Claimant regularly used high dosages of ibuprofen. In September 2012, Claimant was taking Norco for pain. Tr. 475. In December 2012, Dr. Jacobsen noted that Claimant continued to have pain in his left shoulder despite going to physical therapy and taking narcotic pain medications. Tr. 423. This suggests that even prescription pain medication did not alleviate Claimant's pain symptoms. In his April 2013 functional report, Claimant stated that he takes ibuprofen for pain control. Tr. 224. Approximately one month prior, Claimant indicated he was taking prescription pain medication, hydrocodone, prescription anti-nausea medication, and ibuprofen. Tr. 221. The inclusion of anti-nausea drugs with prescription pain killers suggests

PAGE 14 - OPINION AND ORDER

Claimant may have some intolerance to some of these drugs. In December 2013, Claimant was prescribed dilaudid for pain and an anti-nausea medication. Tr. 641.

The record contains abundant evidence that Claimant regularly used prescription and non-prescription pain relief medications. The fact that he was not using pain medication on the date of his hearing does not overcome that evidence. Accordingly, it is not a clear and convincing reason to discredit his subjective pain symptom testimony.

The Commissioner contends that Claimant's failure to fully comply with his diabetes treatment undermines his credibility. This conclusory argument fails to provide any specific reason why lack of compliance with diabetes treatment invalidates Claimant's subjective symptom complaints of pain. *Lingenfelter*, 504 F.3d at 1036. Claimant did not testify about his compliance with his diabetes treatment regime. There is no evidence of record that any lack of compliance with diabetes medication affected Claimant's back, shoulder, or extremity pain. In fact, Dr. Spence testified that Claimant has never had any complications from diabetes. Tr. 42. Therefore, without some connection between Claimant's diabetes treatment and his subjective symptom allegations, this is not a clear and convincing reason to discredit his testimony.

C.      *Pain Management.*

The ALJ determined that Claimant had not participated in "any significant pain regimen program." Tr. 28. Finding that Claimant's physical therapy and chiropractic therapies were "conservative in nature," the ALJ determined that Claimant's care providers' recommendations to use over-the-counter pain medications, combined with recommendations for "stretching, strengthening, walking, and range of motion exercising," were "inconsistent with disability and at

PAGE 15 - OPINION AND ORDER

odds with the claimant's subjective physical limitations as well as the intensity of his alleged pain." Tr. 28.

The Commissioner reiterates the ALJ's conclusion that Claimant's overall pain treatment has been conservative, consisting primarily of over-the-counter medication and physical therapy. Claimant argues that the ALJ is not qualified to assess the severity of an impairment based only on the nature of the treatment, and suggests that a regimen of physical therapy and chiropractic treatment is not conservative.

The ALJ's credibility determination did not rest solely on the nature of Claimant's treatment; it was one of seven reasons. An ALJ may rely on "conservative treatment" or failure to seek treatment as a reason to discount a claimant's subject pain symptom claims provided that claimant did not seek treatment for a good reason, such as the inability to afford the treatment. *See Tommasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008) and *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007). Courts have routinely upheld adverse credibility findings based on "conservative treatment" involving physical therapy and over-the counter pain medication. *Tommasetti*, 533 F.3d 1035; *Parra v. Astrue*, 481 F.3d 742 (9th Cir. 2007). The question, then, is whether the ALJ's characterization of Claimant's treatment as "conservative" is supported by substantial evidence.

Although the ALJ impugned Claimant for a lack of a pain treatment regimen, as noted above, the record reflects that powerful pain medications were periodically prescribed. Tr. 164, 221, 490, 641. Beyond prescription pain medication and physical therapy, the record also reflects that Claimant was treated with a transforaminal epidural steroid injection for lower back pain in December 2009 following more than a year of back pain complaints. Tr. 306-308. Claimant was also treated with subacromial injections for pain in his left shoulder in November 2012 and March

2013. Tr. 455, 453. Although steroid injections are sometimes characterized as conservative,[2] there can be little doubt that Claimant's two shoulder surgeries were not conservative.   In 2010, approximately one year after tearing his right rotator cuff, Claimant underwent surgery on his right shoulder. Tr. 236. After continuing to experience shoulder pain, Claimant underwent an additional "manipulation under anesthesia" of his right shoulder. Tr. 271. In 2012, approximately nine months after sustaining the initial injury to his left shoulder, Claimant underwent the first of two left shoulder surgeries;   the second surgery occurred three months later and Claimant had a poor response. Tr. 409-10, 423, 439.

In sum, the record reflects Claimant's extensive history of seeking treatment for pain. His physicians recommended both conservative and invasive treatments, with mixed results. Accordingly, the ALJ's inaccurate characterization is not supported by substantial evidence, and cannot be affirmed.

> D.    *Activities of Daily Living.*

The ALJ found that Claimant's testimony that he spends most of his day in a recliner conflicts with his "reports indicating he is able to complete many normal daily activities and is able to hunt and fish and stock firewood." Tr. 28. The ALJ noted that Claimant does not require assistance from others to take care of his personal needs or to "perform all normal activities of daily living." Tr. 28. The ALJ opined that Claimant's testimony that he is unable to lift or carry items

---

[2] Compare *Samaniego v. Astrue,* (C.D. Cal. 2012) 2012 WL 254030 (unpublished opinion) (finding treatment with steroid and epidural injections not conservative) *with Lederle v. Astrue,* (E.D. Cal. 2011) 2011 WL 839346 (unpublished opinion) (characterizing epidural steroid injections as conservative treatment); *see also Lapierre-Gutt v. Astrue,* 382 Fed. Appx. 662, 664 (9th Cir. 2010) (unpublished opinion) (assuming but not deciding powerful pain medications and injections can "constitute 'conservative treatment'").

throughout a normal day conflicts with Claimant's testimony that "he could lift his grandchild, whom, he states weighs about 30 pounds." Tr. 27. Furthermore, the ALJ found inconsistencies in Claimant's representations that he has "significant activity limitations in bending and stooping due to back, neck and foot pain, but on the other hand, contends that he is able to help friends with odd jobs, hunt, fish, store firewood, and is able to lift 10-20 pounds." Tr. 27. The ALJ also noted that Claimant is able to drive and "uses his 4-wheeler for both recreational activities and snow plowing." Tr. 27.

Claimant argues that the ALJ misrepresented his testimony and other statements regarding the frequency and duration of his activities. The Commissioner repeats the ALJ's reasoning, arguing that Claimant's activities of daily living are inconsistent with his alleged debilitating symptoms.

To be found disabled, a claimant need not "vegetate in a dark room excluded from all forms of human and social activity." *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (citation omitted). "Daily activities may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferrable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

At the hearing, Claimant testified that he spends most of a typical day sitting in his recliner, stoking firewood in the fireplace. Tr. 57. In his Daily Activities report submitted in February 2012, Claimant described his day as dressing, taking his medications, going to McDonald's for coffee, eating breakfast at home, getting mail, taking care of bills, and watching a movie. Tr. 176. Claimant reported that everyday varies and some days he might do some laundry or bring in "an armload of firewood." *Id*. None of these activities appear to be the type of sustained efforts that would transfer

PAGE 18 - OPINION AND ORDER

to a work setting.

In a typical day, Claimant testified, he drives about six blocks to check the mail and about 3/4 of a mile to his daughter's house to visit his grandchildren. Tr. 57. In response to questioning by the ALJ, Claimant stated that he can drive about 50 miles before he has to "stop and get out and get my back and arms and stuff straightened out again." Tr. 57-58. Claimant noted that the four-wheeler he owns is used for "recreation mostly. Just – I have a snow plow on it, so I can plow my driveway during the wintertime, and occasionally we'll take it out, and I'll let my son-in-law and them use it out hunting." Tr. 58-60. Certainly, Claimant's minimal daily driving to visit his family and check mail are not the type substantial daily activities that would translate to work activity. Claimant's four-wheeler use appears to be infrequent and is mostly confined to plowing his driveway; without more information related to duration and physical demands, if any, required to use the four-wheeler, the court cannot conclude that this minimal activity conflicts with his subjective pain symptoms.

Claimant testified that his granddaughter is about 30 to 35 pounds and that he "can carry her across the room, but then we gotta sit down." Tr. 56. When asked how much he thinks he could lift and carry throughout the day, Claimant answered, "Throughout the day, I don't think anything very much, because I can't – I can't go. I can't keep going." *Id*. Additionally, Claimant testified that he had recently tried to carry his son's algebra book in his left arm from the high school to the parking lot but was unable to carry the weight without changing arms. Tr. 57. The ability to carry a 35 pound child across a room followed by the need to sit down and rest is not the equivalent of being able to lift and carry items throughout a workday, and is, therefore, not inconsistent with Claimant's testimony that he cannot lift and carry much throughout a day. Accordingly, the ALJ's finding is not

PAGE 19 - OPINION AND ORDER

supported by substantial evidence.

The Commissioner suggests that Claimant failed to disclose his activity level to the agency and argues that the ALJ did not have to believe Claimant's representations that he only hunted occasionally or with great difficulty because Claimant made these qualifications at a later time. A review of the record, however, reveals that Claimant's statements regarding his level of activity have been consistent since he filed for DIB.

In his functional report, Claimant listed his hobbies as "riding along on hunting trips, some fishing." Tr. 179. Claimant reported that he went on "hunting ride alongs" four-to-five times a year and fishing one to two times a year. *Id.* Claimant indicated that prior to his alleged disability onset, he went hunting and fishing with much greater frequency. *Id.* Thus, contrary to the Commissioner's contention, Claimant's representations of his activities of daily living at the hearing are consistent with his answers to questionnaires in 2012, and therefore not a valid reason to discredit his subjective pain complaints.

    *E.*    *Odd Jobs and Metal Scrapping.*

Noting that physician records indicated Claimant "continued to work moving steel and metal, a heavy type of activity," the ALJ found that Claimant had been engaged in work activity that conflicted with his subjective claims. Tr. 28. Claimant argues that there is no evidence he regularly engaged in heavy lifting activities.

Claimant's statements to his health care providers provide substantial evidence that he was engaged in work activities. On February 7, 2012, Claimant reported to his physical therapist that his back and neck pain had increased over the past few weeks after helping his son-in-law with metal scrapping, lifting a bit more than usual. Tr. 458. On February 20, 2012, Dr. Soma Lilly noted that

PAGE 20 - OPINION AND ORDER

Claimant "continued to work in the splint" on his right wrist. Tr. 391. On May 2, 2012, Dr. Lilly noted that she suspected Claimant had been removing his splint and using his hands more than he disclosed. Tr. 390. On May 2, 2012, NP Clark noted that Claimant has been "working moving steel/metal" and stated, "I can't just lay on the couch." Tr. 393. On July 2, 2012, Claimant reported that he continued to wear his splint except when he strips copper wire. Tr. 406.

Likewise, Claimant's testimony indicates he continued to perform work. At the hearing, Claimant stated that he had not worked much in the past three years, "just a little bit of odd jobs." Tr. 50. When asked to provide examples of what he meant by "odd jobs," the following exchange occurred:

> Claimant     I was gathering scrap metal, my boys and my son-in-law would help load the materials. I would find them. They would help load, and then we – I would do the driving sometimes where I was able to deliver[] the loads and sell them.
>
> Attorney:    So were you lifting any weight during that or were you just –
>
> Claimant:    Off and on, it was a small amount. I could handle some of the small stuff but nothing of any weight.
>
> Attorney:    Okay. And how much money were you making doing that?
>
> Claimant:    I suppose in a full year, I might make $3,000, maybe $4,000.

Tr. 50.

Similarly, in his application for disability benefits in December 2011, Claimant stated that he was currently working, but that his current impairments had caused him to change his work activity; specifically, that he could only do jobs that provided frequent rest breaks because he could no longer do intensive labor jobs that required heavy lifting. Tr. 156, 161. Claimant stated that he worked about 45 hours throughout the month doing odd jobs. Tr. 158. Consistent with his

testimony, Claimant's 2011 earnings show that he earned an average of $362 month. Tr. 158. Thus, Claimant's DIB application statements, statements to physicians, and hearing testimony, confirm that he continuously engaged in work activities during the relevant period, including metal scrapping. Moreover, Claimant did not cease these activities even though they appear to have exacerbated or prolonged his subjective pain symptoms. *See* Tr. 299-300, 322, 391, 458. Accordingly, there is substantial evidence to support the ALJ's determination that Claimant's work activities conflict with his pain allegations.

F.    *Additional Symptoms and Effects.*

The ALJ considered the lack of evidence of muscle atrophy and weight loss due to pain as a factor in assessing Claimant's level of impairment. Tr. 28. Although the ALJ acknowledged Claimant's "sleep difficulties," the ALJ found there was no link between Claimant's reports of pain and lack of sleep, and concluded that there was no "objective basis" for his alleged need for daily naps. Tr. 28.

Claimant argues that the fact that he does not suffer from every possible symptom is not a valid reason to reject his subjective pain testimony. Citing *Osenbrook v. Apfel*, 240 F.3d 1157, 1166 (9th Cir. 2001), the Commissioner argues that a reasonable person could agree that the absence of these symptoms undermines Claimant's allegations. In *Osenbrook*, the Court never directly addressed whether the absence of weight loss, muscle atrophy, and sleep deprivation due to pain is an acceptable basis for discrediting subjective pain claims; however, the Court upheld the ALJ's adverse credibility determination which included, among other reasons, the absence of symptoms including weight loss, muscle atrophy, and severe sleep deprivation due to pain. *Id.*

It is not clear whether the absence of the symptoms, alone, is a legally sufficient reason to

PAGE 22 - OPINION AND ORDER

discredit a claimant's subjective pain claims. The absence of symptoms as a credibility factor is not specifically addressed in SSR 96-7p. Its replacement, SSR 16-3p, *available at* 2016 WL 1119029 (Mar. 16, 2016), suggests that a person who claims to have spent no more than a few minutes per day walking and standing over the course of a year would be expected to have some signs of muscle wasting, and a claimant who exhibited no such signs might not be fully credible, depending on other evidence in the record. SSR 16-3p, at *4. Without more, a lack of symptoms may not be a sufficient reason to discredit subjective pain claims, but may be considered as a factor when other valid reasons suggest discounting subjective symptom claims.

Here, although Claimant did not lose weight due to severe pain, he appears to have gained weight from inactivity, which is consistent with his claims that he spends most of his day in his recliner due to his subjective symptoms. Claimant's weight fluctuated between 235 pounds in 2010 and 272 pounds in 2013. Tr. 49, 268, 644, 649. In July 2010, dietician Kimberly Jacobs opined that Claimant was overweight, in part, due being home all day and eating out of boredom coupled with lack of physical activity. Tr. 268. In fact, the ALJ found obesity was one of Claimant's severe impairments. Thus, since Claimant's weight gain is not inconsistent with his alleged subjective symptoms, a lack of weight loss due to pain is not a clear and convincing reason to reject Claimant's subjective pain symptoms.

Contrary to the ALJ's contention, the record is replete with links between Claimant's reports of pain and problems with sleep. On Claimant's functional report, he stated that back and neck pain "wake me often during the night." Tr. 176. On August 8, 2012, Claimant told Dr. Scott Jacobsen that pain in his left shoulder is waking him up on a regular basis. Tr. 429. On February 7, 2012, Claimant reported to his physical therapist that he has difficulty sleeping due to low back and neck

PAGE 23 - OPINION AND ORDER

pain. Tr. 459. On September 28, 2012, Claimant informed his physical therapist that he is unable to sleep in his bed due to pain. Tr. 475. On December 5, 2012, Claimant told his physical therapist that he is feeling "horrible, terrible," and is unable to sleep at night. Tr. 487. At the hearing, Claimant testified that, due to left shoulder pain, "I can't sleep on it, extreme pain, all that." Tr. 54. Accordingly, the record reflects Claimant has experienced sleep deprivation due to pain. Therefore, the ALJ's determination cannot be affirmed.

       G.     *Credibility Conclusion.*

      When a court decides that some of the reasons supporting an ALJ's adverse credibility finding are invalid, the inquiry turns on whether the ALJ's reliance on those reasons was harmless error. *Carmickle v. Comm'r*, 533 F.3d 1155, 1162 (9th Cir. 2008). The ALJ provided two valid, clear and convincing rationales to discount Claimant's subjective symptom allegations: (1) lack of objective medical evidence and (2) Claimant's work activity. *Berry v. Astrue,* 622 F.3d 1228, 1234 (9th Cir. 2010). Accordingly, any further error was harmless, and the ALJ's findings must be affirmed.

II.    Formulating Claimant's RFC.

      The ALJ determined Claimant was capable of light work with no additional limitations related to his right shoulder. Tr. 22.

      Claimant argues that the ALJ's step-two determination that his "right shoulder injury, status post-surgery" is a severe impairment contradicts the ALJ's RFC formulation. The Commissioner argues that ALJ's formulation was nonetheless consistent with Claimant's testimony and the medical record.

      The RFC is the most a person can do, despite his physical or mental impairments. 20 C.F.R.

§ 404.1545. In formulating an RFC, the ALJ must consider all medically determinable impairments, including those that are not "severe," and evaluate "all of the relevant medical and other evidence," including the claimant's testimony. *Id.*; SSR 96-8p, *available at* 1996 WL 374184. In determining a claimant's RFC, the ALJ is responsible for resolving conflicts in the medical testimony and translating the claimant's impairments into concrete functional limitations in the RFC. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008). Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the VE. *Osenbrock*, 240 F.3d at 1163-65.

Claimant underwent surgery for right rotator cuff tear and chronic impingement on April 2, 2010. Tr. 236. On August 13, 2010, Claimant's continued pain in his right shoulder was treated with manipulation under anesthesia. Tr. 271. Following surgery, on August 16, 2010, Claimant reported 4/10 pain at physical therapy and showed "some limitation in internal and external rotation." Tr. 271. On January 5, 2012, examining physician Dr. Paulson observed that Claimant's "strength is 5/5 throughout the bilateral upper and lower extremities, except he has pain with right shoulder abduction due to prior rotator cuff injury and surgery." Tr. 296. At the hearing, when asked to list the impairments that prevented him from working, Claimant did not mention any right shoulder limitations. Tr. 53-54. Moreover, when asked whether he could use his arms for repetitive motions throughout the day, Claimant replied, "not the left one. My right one I could probably do quite a bit." Tr. 56. Thus, Claimant's medical records and testimony indicate minimal limitations in his right shoulder.

Light work is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds. Even though the

PAGE 25 - OPINION AND ORDER

weight lifted may be very little, a job is in this category when it
requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or leg
controls. To be considered capable of performing a full or wide range
of light work, you must have the ability to do substantially all of these
activities. . . .

20 C.F.R. § 404.1567(b).

As noted above, Claimant indicated he can lift his 30 pound granddaughter, handle scrap

metal, and is able to lift 10-20 pounds.  Tr. 180.  He stated he could do "quite a bit" with his right

arm.  Therefore, the ALJ's RFC determination that Claimant can perform light work is consistent

with Claimant's right arm capacity.  Neither Claimant's medical records nor his testimony support

additional functional limitations as to Claimant's right shoulder.[3]  Accordingly, the ALJ's RFC

determination is supported by substantial evidence.

III.    Representative Occupations.

Claimant argues that there is a conflict between his RFC and his ability to perform the three

representative occupations identified by the VE.  Claimant argues that his RFC precludes reaching

with his left arm, but each of the representative occupations requires frequent reaching.  The

Commissioner argues that Claimant failed to show any conflict between the VE's testimony and the

Dictionary of Occupational Titles ("DOT"), and since the VE stated that her testimony was

consistent with the DOT, there is no error.

At the hearing, the ALJ posed only one hypothetical question to the VE:

[A]ssume an individual of the same age, education, and work
experience as the claimant.  Having been born in 1966, he falls within

---

[3] Claimant suggests that other medical records (Tr. 408 and 422) show Claimant continued
to suffer right shoulder pain and range of motions problems; however, careful reading of these
records reflect the records cited by Claimant refer to his *left* shoulder.

PAGE 26 - OPINION AND ORDER

the advanced age category and having achieved his GED he falls in the high school and above regulatory category. The individual has the following limitations: limited to light work, postural are all at occasional except ladders, ropes, or scaffolds are at never. Reaching in all directions, left upper extremity is at never. The individual needs to avoid even moderate exposure to hazards such as commercial driving, unprotected heights and moving machinery. That's because of both the diabetes and the [inaudible]. Would such an individual be able to perform any of the claimant's past work?

Tr. 64. The VE responded that Claimant could not perform past relevant work, but had transferrable skills to "several light jobs." Tr. 64-65. The VE then listed the following semi-skilled, light exertional occupations: automobile self-service station, DOT 915.477-010; sales clerk, DOT 290.477-014; and sales clerk food, DOT 290.477-018. Tr. 65.

The DOT and its companion, *The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), are the primary sources of information about the requirements of occupations in the national economy. SSR 00-4p, *available at* 2000 WL 1898704, at *2. SCO defines "reaching" as "extending hand(s) and arm(s) in any direction." SCODICOT Appendix C. According to the SCO, the occupations of sales clerk, sales clerk food, and self-service gas station attendant require reaching frequently. SCODICT 09.04.02. A designation of "frequently" is assigned when the "activity or condition exists from 1/3 to 2/3 of the time." SCODICOT Appendix C. Among the activities that may include reaching for an automobile self- service station attendant are: checking and replenishing fluid levels (*e.g.* oil, windshield wiper fluid, radiator fluid), changing or replacing oil filters, windshield wiper blades, or spark plugs, and repairing or replacing tires. DOT 915.477-010, *available at* 1991 WL 687866. A sales clerk may set up advertising displays or arrange merchandise, clean counters or shelves, and wrap and bag merchandise. DOT 290.477-014, *available at* 1991 WL 672554. A sales clerk food may obtain

PAGE 27 - OPINION AND ORDER

items from freezers, coolers, or shelves, clean or trim poultry or fish, weigh items, and stock merchandise. DOT 290.477-018 *available at* 1991 WL 672555. Neither the DOT nor SCO convey whether a person could perform the requisite reaching tasks with one arm.

The Commissioner, citing *Carey v. Apfel*, 203 F.3d 131 (5th Cir. 2000), argues that the DOT does not require Claimant to be able to reach with both hands. In *Carey*, the claimant, whose left forearm had been amputated following a work place electrocution, testified that he was able to lift 50 pounds with his left arm and that "he still enjoyed fishing and was capable of loading the fishing boat on and off the trailer." *Id.* at 140. The ALJ specifically asked the VE to address the effect of the claimant's amputated left forearm on his ability to perform the representational occupations of usher, cashier, or ticket seller. *Id.* at 140-41. The VE testified that each of the three jobs could be performed with only one arm and hand. *Id.* On appeal, the claimant argued that the VE's testimony was in conflict with the job descriptions in the DOT. *Id.* at 143. Noting that there was not an obvious or direct conflict between the DOT description and the VE's testimony, the court held that an ALJ may rely on a VE's testimony "provided the record reflects an adequate basis for doing so." *Id.* at 145-46.

Here, the record is ambiguous. The ALJ never directly asked whether a person with Claimant's RFC could perform the three representative occupations; however, that inference could reasonably be drawn from reading the transcript. The VE testified that a person with Claimant's age, education, past relevant work experience, and RFC would have transferable skills to three occupations that could be found in significant numbers in the national economy; the RFC included reaching prohibitions of the left arm. The ALJ reasonably extrapolated from the VE's response that a person with Claimant's RFC could perform the jobs of sales clerk, sales clerk food, and automobile

PAGE 28 - OPINION AND ORDER

self-service station.  Accordingly, the ALJ's finding is supported by substantial evidence.

IV.    Transferable Skills.

Claimant argues that the ALJ improperly determined Claimant acquired transferable skills from his past relevant work as an automobile salesperson.  The Commissioner argues that the ALJ reasonably used "common sense" to determine Claimant's transferable skills to other work.

Transferable skills are those work skills "which a person has demonstrated in vocationally relevant past jobs" that can be applied to meet the requirements of other skilled or semi-skilled jobs.  SSR 82-41, *available at* 1982 WL 31389, at *2.  "When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision.  Findings should be supported by appropriate documentation."  *Id.*, at *7.  "When a finding is made that a claimant has transferable skills, the acquired skills must be identified. . . . It is important that these findings be made at all levels of adjudication to clearly establish the basis for the determination."  *Id.*  "Specific findings on transferable skills are necessary even where the ALJ relies on the testimony of a VE."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009).  This is because "meaningful review of an administrative decisions requires access to the facts and reasons supporting that decision."  *Id.* at 1226.

For individuals like Claimant, who is limited to light work and age 55 or over, "there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry."  SSR 82-41, at *5.  Accordingly, "[i]n order to establish transferability of skills for such individuals, the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation."  *Id.*

PAGE 29 - OPINION AND ORDER

At the hearing, Claimant testified that he had worked as an automobile salesperson in his

father's shop from 1998-2008. Tr. 62. The VE described that work as skilled, light exertional, and

opined that Claimant could not perform this past relevant work due to the RFC restriction on driving.

Tr. 62, 64. After the VE testified that Claimant could not perform any of his past relevant work, the

following exchange took place between the ALJ and VE:

| | |
|---|---|
| ALJ: | Does he have any transferable skills to other skilled or semi-skilled employment? |
| VE: | He does have transferable skills to several light jobs |
| ALJ: | Okay. And what would those be? |
| VE: | And automobile-self service station, DOT Code 915.477-010, light exertional level, SVP-3, low end of semi-skilled; 24,000 of these jobs in the national economy. Sales clerk, DOT Code 290.477-014, light exertional level with an SVP of 3, the low end of semi-skilled. 1,265,000 of these jobs, approximately in the national economy. Sales clerk, food, DOT Code 290.477-018, light exertional level with an SVP of 3, the low end of semi-skilled. 255,000 of these positions, approximately, in the national economy. |
| ALJ: | And does any of the testimony that you provided to me today differ from that, which can be found in the Dictionary of Occupational Titles? |
| VE: | No. |

Tr. 64-65.

When asked a clarifying question by Claimant's attorney about the source of Claimant's

transferable skills, the VE replied, "Mostly being a sales, an automobile sales person, just the –

transferable skills came out." Tr. 66. The remainder of the record is equally vague as to Claimant's

job duties as an automobile salesperson. In his work history report, Claimant described his work as

automobile salesperson as, "sell used cars, some light mechanical work." Tr. 193. Ultimately, the

PAGE 30 - OPINION AND ORDER

ALJ concluded that Claimant gained transferable "skills such as customer service, providing vehicle demonstrations, computing and quoting sales pricing, executing sales and financing documents, etc." from his past relevant work as an automobile salesperson.  Tr. 29.

Neither the record, the VE testimony, nor the ALJ's findings provided enough specific information to determine whether Claimant gained transferable skills from past relevant work to perform any of the three representative occupations. *See Bray,* 554 F.3d at 1225. Accordingly, the ALJ's determination was not supported by substantial evidence and remand is required to further develop the record.

*Remand*

Claimant requests that the court remand this decision for an award of benefits.  The Commissioner argues that, should the court find error, the case should be remanded for further proceedings.

"The decision whether to remand a case for additional evidence, or simply to award benefits is within the discretion of the court." *Sprague v. Bowen,* 812 F.2d 1226, 1232 (9th Cir. 1987).  In *Benecke v. Barnhart,* 379 F.3d 587 (9th Cir. 2004), the Ninth Circuit set forth the framework for determining whether a remand for hearing or a remand for benefits is appropriate:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits.

*Id.* at 594 (citations and emphasis omitted).  Evidence rejected by the ALJ should be credited and remand for benefits granted where: "(1) the ALJ failed to provide legally sufficient reasons for

PAGE 31 - OPINION AND ORDER

rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."   *Id.* (citing *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).

In this case, as noted above, remand for further proceedings is required to develop the record regarding transferable skills.

*Conclusion*

For the reasons stated above, the Commissioner's final decision is REVERSED and REMANDED for further proceedings consistent with this opinion.

DATED this 12th day of December, 2016.

_____

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 32 - OPINION AND ORDER